## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### Case No. _____

THE CITY OF WEST PALM BEACH,

          **Plaintiff,**

v.

JEFFERSON B. SESSIONS, in his official
capacity as Attorney General of the United
States; ALAN R. HANSON, in his official
capacity as Principal Deputy Assistant
Attorney General; JON ADLER, in his official
capacity as Director of the Bureau of Justice
Assistance; UNITED STATES DEPARTMENT
OF JUSTICE

          **Defendants.**
_____/

### COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff, by and through its undersigned attorneys, commences this action against the above-named Defendants, and states as follows:

### PRELIMINARY STATEMENT

1. Plaintiff, the City of West Palm Beach ("West Palm Beach" or "City"), brings this action to protect the City from Defendants' repeated and unlawful attempts to use an established federal grant program—the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG"), which has for years provided crucial support for law enforcement in West Palm Beach—as the basis for erroneous and recurring harassment of the City and its officials based upon wrongly perceived non-compliance with Title 8, Section 1373 ("Section 1373") of the United States Code.

2.      West Palm Beach has a vibrant immigrant community, with nearly 27 percent of the City's population consisting of foreign born persons.[1]  As such, immigrants are an integral part of the City's workforce, small business sector, school and college population, and civic associations; their success is vital to the City's success.  To ensure that West Palm Beach's immigrant community continues to thrive, the City adopted a Resolution in March 2017 that seeks to foster trust between the immigrant population and City officials and employees, and to encourage people of all backgrounds to take full advantage of the City's resources and opportunities.

3.      The Resolution in question, West Palm Beach City Commission Resolution 112-17 ("Resolution 112-17"), protects the confidentiality of individuals' immigration and citizenship status information, and prevents the unnecessary disclosure of that information to unauthorized third parties. *See* Ex. 1.  The rationale behind these policies is that if immigrants do not fear adverse consequences to themselves or to their families from interacting with City officers, they are more likely to report crimes, apply for public benefits to which they are entitled, enroll their children in West Palm Beach's public schools, request health services like vaccines, and—all in all—contribute more fully to the City's health and prosperity.

4.      Resolution 112-17, however, specifically and explicitly contains several savings clauses which repeatedly state that all federal laws and related requirements supersede any and all protections and provisions contained within the Resolution.

5.      The City of West Palm Beach has received Byrne JAG funding since 2006.  Over the last five years, the City has received nearly $400,000 in Byrne JAG funds.  These funds have become a staple in the City's budget and are today an important source of funding for the police

---

[1] *See U.S. Census Bureau QuickFacts: West Palm Beach city, Florida,*
https://www.census.gov/quickfacts/fact/table/westpalmbeachcityflorida/PST045217 (last visited Jan. 30, 2018)

department.   Prior to 2017, West Palm Beach has never had any conflicts with the federal government in obtaining Byrne JAG funds.

6.      Beginning on November 15, 2017, the City of West Palm Beach, along with 28 other state and local jurisdictions, became the target of what Defendants deemed to be "concerns about these jurisdictions' Section 1373 compliance. . . ." *See* Ex. 2.

7.      Specifically, Defendants, via letter and press release, ordered the City to take three actions in November 2017: a) address whether West Palm Beach has laws, policies, or practices that violate Section 1373; b) address whether West Palm Beach would comply with Section 1373 throughout the award period should it receive 2017 Byrne JAG funds; and c) explain how any savings clauses in Resolution 112-17 are interpreted by the City and communicated to officers or employees.  *See* Exs. 2, 3.

8.      Even though City officials were alarmed by Defendants' letter at the time, given the plain and unmistakable language of Resolution 112-17, the City nonetheless replied in good faith to Defendants' inquiry on November 29, 2017.  *See* Ex. 4.

9.      The City's response explained that the plain language of Resolution 112-17 clearly and unequivocally requires that all employees and officers follow the law and does not in any way prohibit or otherwise restrict West Palm Beach officers or employees from sending information to, or receiving information, from the Department of Homeland Security, Immigration and Customs Enforcement, or any other Federal Agency when sending and receiving such information is required by Federal Law; the City of West Palm Beach Code of Ordinances; or other binding court decisions, opinions or processes.  *See* Ex. 4.

10.     The City did not take legal action against Defendants in November 2017 out of a spirit of good faith and because, *inter alia*, Defendants' November 2017 letter specifically stated

that "[t]he Department has not made a final determination regarding West Palm Beach's compliance with section 1373. This letter does not constitute final agency action and nothing in this letter creates any right or benefit enforceable at law against the United States." *See* Ex. 3.

11.     Despite, the City's good faith response to Defendants' inquiry, on January 24, 2018, the City received another letter from Defendants stating that "[a]fter reviewing your response, the Department remains concerned that your jurisdiction's laws, policies, or practices may violate section 1373, or, at a minimum, that they may be interpreted or applied in a manner inconsistent with section 1373." *See* Ex. 5.   The new letter demands that the City provide the following documents to the Defendants by no later than February 23, 2018:

> All documents reflecting any orders, directives, instructions, or guidance to your law enforcement employees (including, but not limited to, police officers, correctional officers, and contract employees), whether formal or informal, that were distributed, produced, and/or in effect during the relevant timeframe, regarding whether and how these employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents, whether directly or indirectly.

The letter stated that if the City should "fail to respond in a complete and timely manner, the Department will subpoena these documents in accordance with 34 U.S.C. §§ 10225, 10221, 10230, 10151 – 10158, 10102(a)(6), 10110, and 10110 note."   And, the letter threatened that "[s]hould the Department determine your jurisdiction is out of compliance with section 1373, the Department may, as detailed in your award documents, seek return of your FY 2016 grant funds, require additional conditions for receipt of any FY 2017 Byrne JAG funding for which you have applied, and/or deem you ineligible for FY 2017 Byrne JAG funds."

12.     Unlike the November 2017 letter, the January 2018 letter did not contain the disclaimer that the "Department has not made a final determination," and did not state that the letter did not constitute final agency action.

13.     At the same time Defendants sent their January 2018 letter, they also issued a press release indicating that: a) the number of jurisdictions of concern had fallen from 29 to 23, b) the remaining jurisdictions on the list "will be subject to a Department of Justice subpoena," if they fail to respond to the letter to Defendants' satisfaction; and c) that the Attorney General "continue[d] to urge all jurisdictions under review to reconsider policies that place the safety of their communities and their residents at risk."   *See* Ex. 6.  The Attorney General also stated that "Protecting criminal aliens from federal immigration authorities defies common sense and undermines the rule of law. We have seen too many examples of the threat to public safety represented by jurisdictions that actively thwart the federal government's immigration enforcement—enough is enough."

14.     The imposition of these conditions marks a radical departure from the Department of Justice's past grant-making practices. No statute permits the Attorney General to impose these conditions on the Byrne JAG program.  Although Congress delegated certain authorities to the Attorney General to administer Byrne JAG awards, the Attorney General has far exceeded that delegation here.  Moreover, even if Congress *had* intended to authorize the Attorney General to attach conditions of this nature to JAG grants (which it did not), that would have been unlawful: Demanding that localities certify compliance with Section 1373 and provide documents proving their compliance as conditions of receiving Byrne JAG funds, would flout the limits of Congress' Spending Clause powers under the United States Constitution.

15.     Simply put, the Attorney General's imposition of these conditions on the FY 2016 and FY 2017 Byrne JAG grant is contrary to law, unconstitutional, and arbitrary and capricious.

16.     The City seeks a declaratory judgment confirming that its laws and policies fully comply with Section 1373, to the extent that the statute is lawfully deemed applicable to the Byrne JAG program.    Furthermore, the City also seeks a declaration from the Court stating that Defendants' imposition of the condition that the City comply with Section 1373, and respond to paperwork requests from Defendants seeking to verify their compliance with Section 1373, in order to receive JAG funding is unlawful.   Defendants' agency actions are contrary to federal statute, contrary to the Constitution's separation of powers, and arbitrary and capricious. Further, even if Congress had intended to permit the Defendants' actions, they would violate the Spending Clause.

17.     The City also seeks injunctive relief.   It respectfully requests that the Court permanently enjoin Defendants from imposing compliance with 8 U.S.C. § 1373 as a condition for receiving Byrne JAG funding and COPS funding, as well as any other injunctive relief the Court deems necessary and appropriate to require Defendants to cease and desist their repeated harassment of the City and its officials based upon unfounded concerns of noncompliance with federal law. This includes enjoining Defendants from requiring the City to provide any further responses to Defendants' endless inquiries regarding what it is a very plainly worded City Resolution.

18.     Despite the fact that the City has at all times complied Title 8 Section 1373 of the United States Code, Defendants have repeatedly threatened to withhold and claw back Congressionally appropriated federal funds, and to harass City officials with federal subpoenas, based on their purported dissatisfaction with the City's evidence of compliance with the law.

19.     Defendants' unlawful actions toward the City are inexplicable and are entirely divorced from both the plain language of the City's applicable laws and the City's actual daily practices.  The City has tried in good faith to inform Defendants that there is no absolutely no legal or factual basis for deeming the City to be in violation of Title 8 Section 1373 of the United States Code, but these communications have been unsuccessful in ceasing Defendants' unsubstantiated allegations against the City.

20.     The City is certain that its laws and practices comply with Title 8 Section 1373 of the United States Code.  Nevertheless, Defendants' unfounded concerns about the City's laws and practices have placed at risk the $61,116 in JAG funds received through DOJ's August 29, 2016 award and have created funding uncertainty for the City that requires the City to obtain clarity from this Court.  Additionally, the Edward Bryne Memorial Justice Assistance Grant (JAG) Program: FY 2016 Local Solicitation (CFDA # 16.738) states in pertinent part: "If the applicant is found to be in violation of an applicable federal law [Section 1373] by the Office of Inspector General, the applicant may be subject to criminal and civil penalties in addition to Office of Justice Programs programmatic penalties, including suspension or termination of funds, inclusion on the high risk list, repayment of funds, or suspension and debarment."   *See* Ex. 7.  These application requirements create uncertainty as to what if any criminal and civil penalties could be imposed against the City and its employees and creates additional funding uncertainty for future awards.

21.     While the City has not received a letter from the U.S. Department of Justice relating to its Community Oriented Policing Services (COPS) grant awards, in his Memorandum for all Department Grant-Making Components dated May 22, 2017, the Attorney General stated that the Department of Justice will require jurisdictions applying for certain Department grants to certify their compliance with federal law, including Section 1373 as a condition for receiving an award.

He further explained that the certification requirement will apply to any existing grant administered by the Office of Justice Programs and the Office of Community Oriented Policing Services that expressly contains this certification condition and to future grants for which the Department is statutorily authorized to impose such a condition.  *See* Ex. 8.

22.     In fact, the 2017 COPS Hiring Program (CHP) Application Guide required the City to comply with the new grant condition requiring compliance with Section 1373 regarding prohibitions or restrictions on sending to, requesting or receiving from, maintaining, or exchanging information on citizenship or immigration status, including any prohibitions or restrictions imposed or established by a State or local government entity or official.  Failure to comply with all COPS Office award requirements may result in suspension or termination of award funds, the repayment of award funds and/or other remedies available by law.  *See* Ex. 9.

23.     The COPS program is authorized under the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. 379dd *et. seq*, as amended and the Violent Crime Control and Law Enforcement Act in 1994, Title I Part Q, Public Laws 103-322.  The program is designed to increase the capacity of law enforcement agencies to implement community policing strategies that strengthen partnerships for safer communities and enhance law enforcement's capacity to prevent, solve, and control crime through funding for additional officers.

24.     The City has routinely applied for and received COPS Grant awards for hiring in the amount of $900,000 in August 2003; $1,785,456 in October, 2009; and $1,250,000 in September 2013.   The City applied for but did not received funding for FY 2017.

25.     These awards have been significant to the City in implementing community policing strategies that strengthen partnerships for safer communities and enhancing the police department's ability to prevent, solve, and control crime through funding additional officers.

26.     Because the same certification required for the Byrne JAG funding is required for the COPS funding, the City is unsure whether future COPS awards will be subject to the Defendant's unwarranted concerns relating to the City's compliance with Section 1373 subjecting it to further funding uncertainty and potential civil and criminal penalties.

27.     In addition, the erroneous perception that Plaintiff is either a "sanctuary city" and/or is in violation of Section 1373 is also placing the City's funding from the State of Florida at risk. There are several bills pending in the Florida State Legislature that would financially punish cities the federal government deems as uncooperative on immigration enforcement.

28.     For these reasons, and those discussed below, the Court should declare that the City complies with Section 1373 and that Defendants' immigration-related conditions on Byrne JAG funding and COPS funding are unlawful, as well as enjoining Defendants from further inquiring as to whether Resolution 112-17 violates Section 1373, thereby ensuring that this Resolution can remain in effect.

## PARTIES

29.     Plaintiff City of West Palm Beach is a city organized and existing under the constitution and laws of the State of Florida.  West Palm Beach was incorporated in 1894, and is home to almost nearly 110,000 residents, including a diverse array of immigrant communities from around the world.  Nearly 27 percent of the City's residents are foreign born, and approximately 31 percent of the City's residents speak a language other than English as their primary language spoken at home.

30.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is the federal official in charge of the United States Department of Justice, which took and threatens imminently to take the

governmental actions at issue in this lawsuit. He is sued in his official capacity pursuant to 5 U.S.C. § 702.

31.     Defendant Alan R. Hanson is Principal Deputy Assistant Attorney General in charge of the Office of Justice Programs, which administers JAG funding and which set forth the so-called "special conditions" at issue.  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

32.     Defendant Jon Adler is the Director in charge of Bureau of Justice Assistance within the Office of Justice Programs, which administers JAG funding and which set forth the so-called "special conditions" at issue.  He is sued in his official capacity pursuant to 5 U.S.C. § 702.

33.     Defendant U.S. Department of Justice ("USDOJ") is an executive department of the United States of America pursuant to 5 U.S.C. § 101 and a federal agency within the meaning of 28 U.S.C. § 2671. As such, it engages in agency action, within the meaning of 5 U.S.C. § 702 and is named as a defendant in this action pursuant to 5 U.S.C. § 702. USDOJ is responsible for administering the JAG funds appropriated by Congress.

## STANDING AND NEED FOR IMMEDIATE RELIEF

34.     The City of West Palm Beach is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its sovereignty as a city caused by the challenged federal actions. The inclusion of unconstitutional and unlawful conditions as part of the Byrne JAG award impairs the City's exercise of its police power in a manner it deems necessary to protect the public safety. Because of Defendants' unconstitutional actions, the City of West Palm Beach is in imminent danger of losing $61,116 in JAG funds for fiscal year 2016; $59,970 in JAG funds for fiscal year 2017; and any future Byrne JAG, and potentially COPS, grant funds for which the City may apply.

35.     Defendants actions have placed the City in an untenable position, with the clock winding down: agree, by February 23, 2018, to accept the Department's new unconstitutional grant conditions and hope that yet another explanation of its very clearly worded Resolution will allay the Department's concerns; or stand on its rights and risk forfeiting crucial funds that it has counted on for more than a decade to provide critical (and, at times, lifesaving) equipment, technology and software to West Palm Beach Police officers and critical services to West Palm Beach residents. Moreover, the longer the erroneous perception exists that Plaintiff is either a "sanctuary city" and/or is in violation of Section 1373, the greater the risk to the City's funding from the State of Florida.

## JURISDICTION AND VENUE

36.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.  The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 701, 702, 705, 706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Mandamus Statute, 28 U.S.C. § 1361.

37.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States in their official capacities, brought in the District where the subject of the action is situated, where the Plaintiff resides, and where a substantial part of the events giving rise to the claim occurred.

38.     This action arises within the West Palm Beach Division of this District, wherein occurred a substantial part of the events which give rise to the Plaintiff's claim.

## RIPENESS

39.     This case is ripe for adjudication because the Attorney General has decided to impose the Challenged Conditions on West Palm Beach for the City to receive Byrne JAG Program

11

and COPS Program funds, and that decision is one from which legal consequences will flow, including civil and criminal penalties and the loss of funds.  Moreover, Defendants specifically removed the "non-final determination" language that had been included in their November 2017 letter from their latest letter sent in January 2018.

**FACTUAL ALLEGATIONS**

I.    **WEST PALM BEACH'S POLICIES**

    A.    **Introduction**

40.    West Palm Beach is a rapidly growing city and is recognized as a welcoming city for immigrants from across the globe who seek good jobs and better futures for themselves and their families.  Nearly 27 percent of the City's residents are foreign born, and approximately 31 percent of the City's residents speak a language other than English as their primary language spoken at home.

41.    In early 2017, after hearing from their constituents regarding their fear of accessing City services and resources, the City Commission decided to enact a resolution designed to reassure its residents that the City of West Palm Beach is a welcoming city that celebrates the diversity of its residents.

    B.    **The City of West Palm Beach's Resolution Number 112-17**

42.    As stated in the City Commission Agenda Cover Memorandum, the purpose for the Resolution was to celebrate the cultural diversity and acknowledge the positive contributions of the immigrant communities in West Palm Beach.  *See* Ex. 1.  The City wanted to promote use of its services by all its residents who are eligible to receive them, and let all residents know that they could seek assistance of City agencies regardless of personal or private attributes, without negative

consequences to their personal lives.  And, the City wanted to promote an environment of cooperation between the City's immigrant communities and all City officers and employees.

43.     The key fact supporting the Resolution was the City's finding that assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all its residents, and that the cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City.

44.     Resolution 112-17 contains two provisions that are at issue in this case that pertain to immigration.

45.     Specifically, Section 3 of Resolution 112-17 states as follows:

> No Agent or Agency shall request information about or otherwise investigate or assist in the investigation of the Citizenship or immigration status of any person **unless such inquiry or investigation is required by** Florida Statutes; **Federal Law**; the City of West Palm Beach Code of Ordinances; or other binding court decisions, opinions or processes. Notwithstanding this provision, the City Attorney, or his/her designee, may investigate and inquire about immigration status when relevant to potential or actual litigation or an administrative proceeding in which the Cities or may be a party.

(emphasis added). In plain English, this provision expresses a City policy instructing employees not to take matters into their own hands and suddenly become self-appointed immigration investigators when they have been hired by the City to perform other duties such as being a librarian, a social worker, or a police officer.

46.     By the same token, this same provision clearly and unambiguously instructs City employees and agencies to conduct any and all immigration inquiries or investigations that are required under federal law.

47.     The second provision at issue is Section 4 of Resolution 112-17, which states as follows:

> No Agent or Agency shall disclose information regarding the Citizenship or immigration status of any person **unless required to do so pursuant to** Florida Statutes; **Federal Law;** the City of West Palm Beach Code of Ordinances; other binding court decisions, opinions, or processes; or when such disclosure has been authorized in writing by the individual to whom such information pertains, or if such individual is a minor or is otherwise not legally competent, by such individual's parent or guardian.

(emphasis added).  In plain English, this provision expresses a City policy instructing employees that, if they take possession of information regarding the Citizenship or immigration status of any person in the City, they should not to take matters into their own hands and suddenly become self-appointed immigration enforcement officials when they have been hired by the City to perform other duties such as being a librarian, a social worker, or a police officer.

48.     By the same token, this same provision clearly and unambiguously instructs City employees and agencies to provide any and all information regarding the Citizenship or immigration status of any person that is required under federal law.

49.     A further critical fact about Resolution 112-17 is that the City expressed these sentiments and factual findings in the form of a resolution, which is a formal expression of the policy position of the City Commission which staff are encouraged to follow, as opposed to an ordinance, which has the force and effect of a law, the violation of which may actually be enforced in a county or circuit court.

50.     Resolution 112-17 was simply a memorialization of the exact state of affairs that has existed in the City of West Palm Beach for decades regarding how the City handles matters related to the immigration status of its residents.

14

### C. Other Relevant Policies and Practices

51.     In addition to the clear and unambiguous text of Resolution 112-17, which clearly does not prohibit any cooperation between federal immigration enforcement officials and City Officials, it is also well known to the Federal Government that the City of West Palm Beach cooperated with requests from Immigration and Customs Enforcement when those requests arise. In fact, on April 9, 2015, the City of West Palm Beach has entered into a Memorandum of Understanding with the U.S. Immigration and Customs Enforcement Homeland Security Investigation, which states in pertinent part:

> The Parties agree that effective enforcement of the laws relating to HSI jurisdiction requires close cooperation and coordination between the two Parties.  The Parties have therefore entered into this MOU to govern use of HSI designations by certain employees of the West Palm Beach Police Department. . . . However in designating Customs Officers (Excepted), *HSI is not conveying the authority to enforce administrative violations of immigration law*.

*See* Ex. 10.

52.     Moreover, when an individual is arrested by City police, they are booked into the Palm Beach County Jail, which is run by the Palm Beach County Sheriff's Office.  It is at that moment when issues regarding an individual's immigration status are likely to arise.  Any concerns raised by Defendants about information sharing between local police and Immigration and Customs Enforcement would thus occur at the County level and not at the City level.

## II. THE BYRNE JAG PROGRAM AND 2017 GRANT CONDITIONS

### A.     Overview of the Byrne JAG Program

53.     Congress created the modern-day Byrne JAG program in 2005 as part of the Violence Against Women and Department of Justice Reauthorization Act. *See* Pub. L. No. 109-162 (codified at 42 U.S.C. § 3751 *et seq.*). In fashioning the present-day Byrne JAG grant, Congress merged two prior grant programs that had also provided criminal justice assistance

funding to states and localities. These two predecessor grant programs were the Edward Byrne Memorial Formula Grant Program, created in 1988, and the Local Law Enforcement Block Grant Program.[2]

54.    Today, grants under the Byrne JAG program are the primary source of federal criminal justice funding for states and localities. As stated in a 2005 House Report accompanying the bill, the program's goal is to provide State and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. *See* H.R. Rep. No. 109-233, at 89 (2005).

55.    The authorizing statute for the Byrne JAG program provides that localities can apply for funds to support a range of local programming to strengthen their criminal justice systems. For instance, localities can apply for funds to support "law enforcement programs, prosecution and court programs, prevention and education programs, corrections and community corrections programs, drug treatment and enforcement programs," and "crime victim and witness programs." 42 U.S.C. § 3751(a)(1).

56.    Byrne JAG funding is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed formula. *See* 42 U.S.C. § 3755(d)(2)(A). The formula for states is a function of population and violent crime, *see id.* § 3755(a), while the formula for local governments is a function of the state's allocation and of the ratio of violent crime in that locality to violent crime in the state as a whole, *see id*. § 3755(d).

57.    Unlike discretionary grants, which agencies award on a competitive basis, "formula grants . . . are not awarded at the discretion of a state or federal agency but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).

---

[2] See Nathan James, *Edward Byrne Memorial Justice Assistance Grant ("JAG") Program*, Congressional Research Service (Jan. 3, 2013), https://goo.gl/q8Tr6z.

States and local governments are entitled to their share of the Byrne JAG formula allocation as long as their proposed programs fall within at least one of eight broadly-defined goals, *see* 42 U.S.C. § 3751(a)(1)(A)-(H), and their applications contain a series of statutorily prescribed certifications and attestations, *see id.* § 3752(a).

58.     The City of West Palm Beach has filed direct applications for Byrne JAG funding every year since the 2006.   All its applications have been granted; the City has never been denied Byrne JAG funds for which it applied. For instance, in FY 2016, West Palm Beach received $61,115 in its direct Byrne JAG award. That award was dated August 30, 2016. In FY 2015, the City received $52,437 in its direct Byrne JAG award. Over the past ten years, excluding funds received as part of the 2009 Recovery Act, West Palm Beach's annual Byrne JAG award has averaged $74,997 and has ranged between $118,338 (in 2007) to $61,116 (in 2016).

59.      Over the last five years, the Department has routinely disbursed West Palm Beach's JAG award in September and August of the particular grant year, and the money is immediately obligated by the City's criminal justice agencies to fund pressing needs. However, the City has not yet been awarded funds for FY2017.

60.     The City is also eligible for, and has previously been awarded, competitive sub-grants from the annual Byrne JAG award to the State of Florida.

61.     West Palm Beach uses the federal funding provided by the Byrne JAG program to support a number of priorities within and improvements to its criminal justice system. In recent years, a significant portion of West Palm Beach's Byrne JAG funding has gone towards West Palm Beach Police Department technology and equipment enhancements, training, and over-time payments to police officers. It is clear, then, that the funds that the City receives from the Byrne JAG program play a vital role in many facets of the City's criminal justice programming.

62.     For FY 2017, West Palm Beach has applied for $59,970 in funding and intends to use its JAG award for, among other things, providing maritime security required by Presidential visits to the area.

### B.     Conditions for Byrne JAG Funding

63.     The statute creating the Byrne JAG program authorizes the Attorney General to impose a limited set of conditions on applicants. First, the statute authorizes the Attorney General to require that applicants supply information about their intended use of the grant funding, and to demonstrate that they will spend the money on purposes envisioned by the statute. See 42 U.S.C. § 3752(a)(2) & (5) (the Attorney General can insist upon assurances by applicants that "the programs to be funded by the grant meet all the requirements of this part" and "that Federal funds . . . will not be used to supplant State or local funds"). Second, the statute allows the Attorney General to require that applicants provide information about their budget protocols; for instance, he can insist that a recipient of a Byrne JAG "maintain and report such data, records, and information (programmatic and financial) as [he] may reasonably require." Id. § 3752(a)(4). Third, the Attorney General can demand that localities "certif[y]," in conjunction with their applications for funding, that they "will comply with all provisions of this part and all other applicable Federal laws." *Id*. § 3752(a)(5)(D). Finally, the statute authorizes the Attorney General to "issue Rules to carry out this part." *Id*. § 3754.

64.     That is all. The above delegations of authority do not include a general grant of authority to the Attorney General to impose new obligations the Attorney General himself creates and that are neither traceable to existing "applicable Federal law[]" nor reflected in "provisions of this part" (*i.e.*, the JAG statute itself). *See id*. § 3752(a)(5)(D). Congress' decision *not* to delegate to the Attorney General such a broad scope of authority was intentional and clear.

65.     Time and time again, Congress has demonstrated that it knows how to confer agency discretion to add substantive conditions to federal grants when it wants to. *See, e.g.*, 42 U.S.C. § 3796gg-1(e)(3) (authorizing the Attorney General to "impose reasonable conditions on grant awards" in a different program created by the Omnibus Control and Safe Streets Act); 42 U.S.C. § 14135(c)(1) (providing that the Attorney General shall "distribute grant amounts, and establish grant conditions . . ."); *see also Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-617 (1980) ("Where Congress explicitly enumerates certain exceptions," its "omission" of a different exception means "only one inference can be drawn: Congress meant to" exclude that provision).

66.     Furthermore, the Attorney General has never imposed conditions on Byrne JAG applicants beyond the bounds of his statutory authority, *i.e.*, conditions that neither reflect "applicable Federal laws" nor that relate to the disbursement of the grants themselves.  Past conditions almost all related to the administration and expenditure of the grant itself.  The few conditions that apply to the general conduct of the recipient or subrecipient are expressly made applicable to federal grantees by statute.

67.     The Department of Justice's new conditions do not apply to the expenditure of the grant funding, and the Section 1373 condition refers to a federal law that is wholly inapplicable to the JAG grant. The Department offered no statistics, studies, or legal authority to support its imposition of these 2017 conditions as promoting public safety and the law enforcement purposes of the JAG program.

68.     Had Congress authorized the Attorney General to create new substantive conditions for Byrne JAG funds at his choosing, that would have upended Congress' formula approach for distributing funds under the program based on population and violent crime. That in turn would have resulted in the allocating of grants according to criteria invented by the Department of Justice. That is not the program Congress created. *See Amalgamated Transit Union v. Skinner*, 894 F.2d

1362, 1364 (D.C. Cir. 1990) ("Where Congress prescribes the form in which an agency may exercise its authority, . . . we cannot elevate the goals of an agency's action, however reasonable, over that prescribed form.").

69.     Congress's decision to use a formula grant mechanism, namely, "in accordance with the formula established under section 10156 of this title," impacts its use of the phrase "may … make grants to States and units of local government." 34 U.S.C. § 10152(a)(1). Read together, this language demonstrates that Congress imposed a non-discretionary duty to issue JAG awards. It is, as in other statutory schemes, a mandate to issue JAG awards, not a delegation of discretion to the Attorney General. See, e.g., *United Hosp. Ctr., Inc. v. Richardson*, 757 F.2d 1445, 1453 (4th Cir. 1985) ("While the term 'may' in a statute or agency regulation dealing with agency power is generally construed as permissive rather than mandatory, the construction of such term—whether discretionary or mandatory—is reached in every case 'on the context of the statute [or regulation], and on whether it is fairly to be presumed that it was the intention of the legislature [or agency] to confer a discretionary power or to impose an imperative duty.'" (brackets in original)); id. ("There can be no question that the board intended the challenged provision in this regulation, even though stated in terms of 'may,' to be mandatory."); *Wilson v. United States*, 135 F.2d 1005, 1009 (3d Cir. 1943) ("[T]he word 'may', ordinarily permissive in quality, is frequently given a mandatory meaning where a public body or officer is clothed by statute with power to do an act which concerns the public interest, or the rights of third persons. In such cases, what they are empowered to do for the sake of justice, or the public welfare, the law requires shall be done. The language, although permissive in form, is, in fact peremptory." (ellipsis omitted) (citing *Bd. of Supervisors of Rock Island Cty. v. U.S. ex rel. State Bank*, 71 U.S. 435 (1866)).

C.      **Section 1373 Condition**

70.      On February 26, 2016, Congressman John Culberson, Chairman of the House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies, sent a letter to then-Attorney General Loretta Lynch, inquiring whether recipients of Department of Justice grants were complying with Section 1373.[3]

71.      The Culberson letter spurred the Office of Justice Programs ("OJP") at the Department of Justice to ask that the Department's Office of Inspector General ("OIG") investigate local jurisdictions' compliance with Section 1373. In an email sent from OJP to Inspector General Michael Horowitz on April 8, 2016, OJP indicated that it had "received information" indicating that several jurisdictions who receive OJP funding may be in violation of Section 1373 and attached a spreadsheet of over 140 state and local jurisdictions that it wanted OIG to investigate.[4]

72.      On May 31, 2016, Inspector General Horowitz transmitted a report to Department of Justice Assistant Attorney General Karol Mason, reviewing the policies of ten state and local jurisdictions, and whether they comply with Section 1373. The jurisdictions analyzed were: Connecticut, California, City of Chicago (Illinois), Clark County (Nevada), Cook County (Illinois), Miami-Dade (Florida), Milwaukee County (Wisconsin), Orleans Parish (Louisiana), Philadelphia (Pennsylvania) and New York City. The report expressed "concerns" with several of the localities' laws and policies. The report did not analyze the effects of any of the ten local jurisdictions' policies on crime rates or public safety.  And most notably, the report expressed no concerns about West Palm Beach.

---

[3] *See* Letter from Cong. Culberson to Attorney General Lynch (Feb. 26, 2016), available at https://goo.gl/Cytb3B. Congressman Culberson's letter was accompanied by analysis from the Center for Immigration Studies, a non-profit institute that describes itself as "animated by a 'low-immigration, pro-immigrant' vision of America that admits fewer immigrants but affords a warmer welcome for those who are admitted." About the Center for Immigration Studies, Center for Immigration Studies (last visited January 30, 2018), https://goo.gl/GrsfoQ.
[4] See Ex. 7.  (Memorandum from Department of Justice Inspector General Michael Horowitz to Assistant Attorney General Karol Mason (May 31, 2016) (describing OJP's earlier email to OIG)).

73.     On July 7, 2016, Assistant Attorney General Mason, who then oversaw the Office of Justice Programs, sent a Memorandum to Inspector General Horowitz conveying that, in response to OIG's report, "the Office of Justice Programs has determined that Section 1373 is an applicable federal law for the purposes of the Edward Byrne Memorial Justice Assistant Grant (JAG) program and the State Criminal Alien Assistance Program (SCAAP)." There was no analysis supporting this conclusion whatsoever, nor any explanation for why OJP had not reached that conclusion during the prior ten years that it administered the JAG program.

74.     Also on July 7, 2016, the Office of Justice Programs released a Question and Answer "Guidance" document, entitled "Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373." *See* Ex. 11.  The Q&A Guidance document stated that under the Department's new policy, "[a] JAG grantee is required to assure and certify compliance with all applicable federal statutes, including Section 1373." The document explained that Section 1373 "prevents federal, state, and local government entities and officials from 'prohibit[ing] or in any way restrict[ing]' government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status." But it further stated that "Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that statutes and localities take specific actions upon obtaining such information."

75.     On October 6, 2016, OJP released a document entitled "Additional Guidance Regarding Compliance with 8 U.S.C. § 1373." *See* Ex. 12.  That document addressed the question, "Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?" And it answered: "No FY 2016 or prior year Byrne/JAG or SCAAP funding will be impacted. However, OJP expects that JAG and SCAAP recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG and SCAAP funding in FY 2017."

76.     As Defendants have conceded in other cases, Section 1373 imposes no affirmative obligation on state or local entities to collect immigration status information or take any specific actions upon receiving immigration status information.

77.     Within a week of taking office, on January 25, 2017, President Trump issued Executive Order 13768, a sweeping order aimed at punishing "sanctuary" jurisdictions. Entitled "Enhancing Public Safety in the Interior of the United States," the order announced that it is the policy of the Executive Branch to withhold "Federal funds" from "jurisdictions that fail to comply with applicable Federal law" by acting as "sanctuary jurisdictions." Exec. Order 13768 §§ 1, 2(c). The Order directed the Attorney General and the Secretary of Homeland Security to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants," and authorized the Secretary of DHS to "designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction." Id. § 8(a). The Order was ultimately enjoined in large part by the United States District Court for the Northern District of California because the court found that it violated multiple constitutional provisions. *County of Santa Clara v. Trump*, --- F. Supp. 3d ----, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017).

78.     As the Santa Clara case unfolded, the Defendants sharpened their focus—both within the context of that lawsuit and more broadly—on denying local jurisdictions grants disbursed by the Departments of Justice and Homeland Security in particular, as the mechanism for carrying out the Administration's efforts to crack down on so-called sanctuary cities. At the preliminary injunction hearing in March in the Santa Clara case, the lawyer for the government represented that the Executive Order only applied to three federal grants administered by the Departments of Justice and Homeland Security. Id. at *1.

23

     **D.**     **Defendants' November 15, 2017 Letter to the City of West Palm Beach and Accompanying Press Release**

79.     On November 15, 2017, Defendants issued a press release entitled "Justice Department Sends Letters to 29 Jurisdictions Regarding Their Compliance with 8 U.S.C. 1373." *See* Ex. 2.  The press release announced that "[t]he Department of Justice today sent the attached letters to 29 jurisdictions that may have laws, policies, or practices that violate 8 U.S.C. 1373, a federal statute that promotes information sharing related to immigration enforcement."

80.     The press release explained that "Jurisdictions that were found to have possible violations of 8 U.S.C. 1373 will have until December 8, 2017 to demonstrate that the interpretation and application of their laws, policies, or practices comply with the statute."

81.     The press release also included a statement from the Attorney General indicating that he "urge[d] all jurisdictions found to be potentially out of compliance in this preliminary review to reconsider their policies that undermine the safety of their residents. We urge jurisdictions to not only comply with Section 1373, but also to establish sensible and effective partnerships to properly process criminal aliens."

     **E. The City's November 29, 2017 Response to Defendants' November 15, 2017 Letter**

82.     Even though City officials were alarmed by Defendants' press release and letter at the time, given the plain and unmistakable language of Resolution 112-17, the City nonetheless replied in good faith to Defendants' inquiry on November 29, 2017.  *See* Ex. 4.

83.     The City's response explained that Resolution 112-17 clearly and unequivocally requires that all employees and officers follow the law and does not in any way prohibit or otherwise restrict West Palm Beach officers or employees from send to or receiving information from the Immigration and Naturalization Service or any other Federal Agency when sending and

receiving such information is required by Federal Law; the City of West Palm Beach Code of Ordinances; or other binding court decisions, opinions or processes.

84.     The City did not take legal action against Defendants in November 2017 out of a spirit of good faith and because, *inter alia*, Defendants' November 2017 letter specifically stated that "[t]he Department has not made a final determination regarding West Palm Beach's compliance with section 1373. This letter does not constitute final agency action and nothing in this letter creates any right or benefit enforceable at law against the United States." *See* Ex. 3.

### F.     Defendants' January 24, 2017 Letter to the City of West Palm Beach and Accompanying Press Release

85.     Despite, the City's good faith response to Defendants' inquiry, on January 24, 2018, the City received another letter from Defendants stating that "[a]fter reviewing your response, the Department remains concerned that your jurisdiction's laws, policies, or practices may violate section 1373, or, at a minimum, that they may be interpreted or applied in a manner inconsistent with section 1373." *See* Ex. 5.   The new letter demands that the City provide the following documents to the Defendants by no later than February 23, 2018:

> All documents reflecting any orders, directives, instructions, or guidance to your law enforcement employees (including, but not limited to, police officers, correctional officers, and contract employees), whether formal or informal, that were distributed, produced, and/or in effect during the relevant timeframe, regarding whether and how these employees may, or may not, communicate with the Department of Justice, the Department of Homeland Security, and/or Immigration and Customs Enforcement, or their agents, whether directly or indirectly.

The letter stated that if the City should "fail to respond in a complete and timely manner, the Department will subpoena these documents in accordance with 34 U.S.C. §§ 10225, 10221, 10230, 10151 – 10158, 10102(a)(6), 10110, and 10110 note."  And, the letter threatened that "[s]hould the Department determine your jurisdiction is out of compliance with section 1373, the Department

may, as detailed in your award documents, seek return of your FY 2016 grant funds, require additional conditions for receipt of any FY 2017 Byrne JAG funding for which you have applied, and/or deem you ineligible for FY 2017 Byrne JAG funds."

86.     Unlike the November 2017 letter, the January 2018 letter did not contain the disclaimer that the "Department has not made a final determination," and did not state that the letter did not constitute final agency action.

87.     At the same time Defendants sent their January 2018 letter, they also issued a press release indicating that: a) the number of jurisdictions of concern had fallen from 29 to 23, b) the remaining jurisdictions on the list "will be subject to a Department of Justice subpoena," if they fail to respond to the letter to Defendants' satisfaction; and c) that the Attorney General "continue[d] to urge all jurisdictions under review to reconsider policies that place the safety of their communities and their residents at risk."   *See* Ex. 6.  The Attorney General also stated that "Protecting criminal aliens from federal immigration authorities defies common sense and undermines the rule of law. We have seen too many examples of the threat to public safety represented by jurisdictions that actively thwart the federal government's immigration enforcement—enough is enough."

88.     The City is being targeted by Defendants for no justifiable or understandable purpose because it is undeniably clear that there is absolutely no way the City is violating Section 1373.  This targeting is unjustifiably placing the City at a risk of losing critical federal and state funding it does not deserve to lose.

89.     Because of the injuries West Palm Beach will suffer in all of the above circumstances, the City faces a significant danger of harm due to the Defendants' continual imposition of uncertain conditions for receiving the FY 2017 Byrne JAG grant, keeping its FY 2016 Byrne JAG funds, and potentially receiving COPS grant funding in the future.

## CAUSES OF ACTION

### COUNT I
### (Declaratory Judgment Act: The City of West Palm Beach Complies with 8 U.S.C. § 1373)

90.     Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-89.

91.     The City of West Palm Beach certified its compliance with Section 1373 to the Department of Justice both in its FY 2016 and FY 2017 application for Byrne JAG funding and also in its November 29, 2017 letter to Defendants signed by the City Attorney and describing the basis for the City's compliance. *See* Exs. 13 and 14.

92.     The City of West Palm Beach complies with Section 1373 to the extent it can be constitutionally enforced vis-a-vis the City.

93.     The City's policies, namely Resolution 112-17, direct City officials and employees not to collect immigration status information unless such collection is required by state or federal law.  Because West Palm Beach cannot restrict the sharing of information it does not collect, the City's policy of non-collection renders it necessarily compliant with Section 1373 for all cases covered by the non-collection policy.

94.     Moreover, Resolution 112-17, clearly permits disclosure of information regarding the citizenship or immigration status of any person when required pursuant to federal law.  And, it clearly provides lawful authorization for any Agent or Agency to request information about or otherwise investigate or assist in the investigation of the Citizenship or immigration status of any person when required by federal law.

95.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that it complies with Section 1373 as properly construed.

## COUNT II
### (Violation of the Administrative Procedure Act through *Ultra Vires* Conduct Not Authorized by Congress in the Underlying Statute)

96.     Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-89.

97.     The Department of Justice may only exercise authority conferred by statute. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).

98.     The Byrne JAG statute provides no authority to the Attorney General to impose conditions on the receipt of Byrne JAG funds that are neither reflected in "applicable Federal laws" nor concern the administration of the JAG program itself.

99.     The conditions added to the FY 2017 grant by the Department of Justice are neither "applicable Federal laws" nor conditions that deal with the administration and spending of the Byrne JAG funds.

100.    The Attorney General's imposition of the new conditions is unauthorized by statute.

101.    The Attorney General's imposition of the new conditions also contradicts the formula-grant structure of the Byrne JAG program. *See* 42 U.S.C. § 3755(d)(2)(A).

102.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdictions, authority, or limitations[.]" 5 U.S.C. § 706(2)(A)-(C). The Act further demands courts to "compel agency action [that is] unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

103.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Attorney General is without the statutory authority to impose the Section 1373 certification and proof of compliance conditions on FY 2017 Byrne JAG funds, and in doing so, has acted

contrary to law under the APA. Plaintiff is also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

## COUNT III
### (Violation of the Administrative Procedure Act through Violation of the Constitution's Separation-of-Powers)

104.    Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-89.

105.    The Constitution vests Congress, not the President or officials in the Executive Branch, with the power to appropriate funding to "provide for the . . . general Welfare of the United States." U.S. Const. art I, § 8, cl. 1.

106.    The President's constitutional duty—and that of his appointees in the Executive Branch—is to "take Care that the Law be faithfully executed." U.S. Const. art. II, § 3, cl. 5.

107.    The President "does not have unilateral authority to refuse to spend . . . funds" that have already been appropriate by Congress "for a particular project or program." *In re Aiken Cnty*., 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); see also *Train v. City of New York*, 420 U.S. 35, 44 (1975).

108.    The President also cannot amend or cancel appropriations that Congress has duly enacted because doing such violates the Presentment Clause of the Constitution and results in the President purporting to wield a constitutional power not vested within his office. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

109.    Imposing a new condition on a federal grant program amounts to refusing to spend money appropriated by Congress unless that condition is satisfied.

110.    The Section 1373 condition was not imposed by Congress, but rather by the Department of Justice in issuing its Office of Justice Program Guidance for FY 2016 Byrne JAG

awards and its FY 2017 Byrne JAG application. Therefore, the Section 1373 condition amounts to an improper usurpation of Congress's spending power by the Executive Branch.

111.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Attorney General's imposition of the Section 1373 compliance and verification conditions violates the constitutional principle of separation of powers and impermissibly arrogates to the Executive Branch power that which is reserved for the Legislative Branch. Plaintiff is also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

**COUNT IV**
**(Violation of the Administrative Procedure Act through Arbitrary and Capricious Agency Action)**

112.     Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-89.

113.     The Department of Justice's decision to impose the Section 1373 compliance and verification conditions on the receipt of FY 2016 and FY 2017 Byrne JAG and COPS funds deviates from past agency practice without reasoned explanation or justification.

114.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Attorney General's imposition of the Section 1373 compliance and verification conditions is arbitrary and capricious. Plaintiff is also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

**COUNT V**
**(Spending Clause)**

115.     Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-89.

116.    Congress could not have authorized the immigration-related conditions attached the Byrne JAG award here because they do not satisfy the requirements of the Spending Clause of the Constitution.

117.    None of the three conditions—attestation of compliance with Section 1373, verification of compliance with Section 1373, and providing affirmative statements of willingness to enforce immigration law—is "reasonably related" or "germane[]" to the federal interest that underlies the Byrne JAG or the COPS grant program. *See South Dakota v. Dole*, 483 U.S. 203, 207-08 & n.3 (1987) (conditions must be "reasonably related," or "germane[]," to the particular program); *see also New York v. United States*, 505 U.S. 144, 167 (1992) (the attached "conditions must . . . bear some relationship to the purpose of the federal spending"). The three conditions all deal with federal civil immigration enforcement, not localities' enforcement of state or local criminal law.

118.    The three conditions threaten the federal interest that underlies the Byrne JAG and COPS program. They undermine Congress's goals of dispersing funds across the country, targeting funds to combat violent crime, respecting local judgment in setting law enforcement strategy, and increasing local law enforcement hiring to implement community policing strategies which enhance law enforcement's capacity to prevent, solve, and control crime.

119.    The Department's imposition of the conditions also violates the requirement that Spending Clause legislation "impose unambiguous conditions on states, so they can exercise choices knowingly and with awareness of the consequences." *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002).

120.     Moreover, because the conditions are ambiguous, they arguably require cities to infringe on individuals' Fourth and Fifth Amendment rights, violating the prohibition on Spending Clause conditions that "induce unconstitutional action." *Koslow*, 302 F.3d at 175.

121.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the imposition of the three immigration-related conditions for the FY 2016 and FY 2017 Byrne JAG and the COPS grant program violates the Constitution's Spending Clause as well as an injunction preventing those conditions from going into effect.

### COUNT VI
### (Tenth Amendment: Commandeering)

122.     Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-89.

123.     The Tenth Amendment prohibits the federal government from "requir[ing]" states and localities "to govern according to Congress's instructions," New York, 505 U.S. at 162, and from "command[ing] the States' officers . . . to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

124.     Where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional, *Printz*, 521 U.S. at 932, and must be enjoined, *id.* at 935; *New York*, 505 U.S. at 186-187. That description precisely fits each of the three immigration-related conditions.

125.     If Section 1373 is interpreted to extend to information sharing about witnesses, victims, and law-abiding persons in the City, and to require that West Palm Beach provide federal authorities unfettered access to immigration status information about such persons, that would hamper the City's ability to ensure law and order. As a result, West Palm Beach's personnel would

be "commandeered" to perform federal functions rather than to pursue local priorities, in violation of the Tenth Amendment.

126.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that if Section 1373 is construed by the Department to conflict with West Palm Beach's local policies, that would result in a violation of the Tenth Amendment. Plaintiff is entitled to a permanent injunction preventing the Department from taking such an interpretation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

a.    Declare that the City of West Palm Beach complies with 8 U.S.C. § 1373 as properly construed;

b.    Declare that all immigration-related conditions for the FY 2016 and 2017 Byrne JAG and COPS grants are unlawful;

c.    Permanently enjoin the Defendants from enforcing Section 1373 conditions for the FY 2016 and 2017 Byrne JAG award and future JAG and COPS grants awards and retain jurisdiction to monitor the Department's compliance with this Court's judgment;

d.    Grant such other relief as this Court may deem proper; and

e.    Award the City of West Palm Beach reasonable costs and attorneys' fees.

Respectfully submitted,                           Dated: February 6, 2018

/s/ Kimberly L. Rothenburg                        /s/ Leon Fresco

KIMBERLY L. ROTHENBURG                            LEON FRESCO
City Attorney                                     HOLLAND & KNIGHT LLP
CITY OF WEST PALM BEACH                           801 17th Street, NW, Suite 110
400 Clematis Street, 5th Floor                    Washington, DC 20006
West Palm Beach, FL  33401                        Telephone: (202)469-5129
Telephone (561)822-1360                           Fax: (202)955-5564
Fax: (561) 822-1573                               Florida Bar: 0673943
Florida Bar: 0938971                              Email: leon.fresco@hklaw.com
E-mail: krothenburg@wpb.org

/s/ Alison K Brown
Alison K Brown (68371)
HOLLAND & KNIGHT LLP
222 Lakeview Ave Ste 1000
West Palm Beach, FL 33401-6148
Telephone: (561) 650-8361
Facsimile:  (561) 650-8399
Email:   alison.brown@hklaw.com

*Counsels for Plaintiff, The City of West Palm Beach*